UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Foss Manufacturing
Company, LLC

          v.                         Civil No. 08-264-JL
                                     Opinion No. 2009 DNH 037
S Group Automotive, LLC

**O R D E R**

     The defendant, S Group Automotive, LLC, moves to dismiss
this breach of contract action by the plaintiff, Foss
Manufacturing Company, LLC, for lack of personal jurisdiction.
The court has subject-matter jurisdiction under 28 U.S.C.
§ 1332(a)(1) (diversity), because the amount in controversy
exceeds $75,000 and none of the members of S Group, a limited
liability company, is a citizen of the same state as any member
of Foss, also a limited liability company.[1]  See Pramco, LLC ex
rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc., 435 F.3d
51, 54-55 (1st Cir. 2006).  After oral argument, and for the
foregoing reasons, the motion to dismiss is granted.

I.   **Applicable legal standard**

     The plaintiff bears the burden of establishing personal
jurisdiction over a defendant.  See, e.g., Hannon v. Beard, 524

---

[1]Counsel confirmed this at oral argument.

F.3d 275, 279 (1st Cir.), <u>cert. denied</u>, 129 S. Ct. 726 (2008).
Only a prima facie showing is necessary to carry this burden
where, as here, the defendant has challenged personal
jurisdiction through a motion to dismiss under Rule 12(b)(2) of
the Federal Rules of Civil Procedure.  <u>See Daynard v. Ness,
Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 51 (1st
Cir. 2002).  The court "'accept[s] the plaintiff's (properly
documented) evidentiary proffers as true for the purpose of
determining the adequacy of the prima facie jurisdictional
showing,'" construing them in the light most favorable to
jurisdiction.  <u>Id.</u> (quoting <u>Foster-Miller, Inc. v. Babcock &
Wilcox Can.</u>, 46 F.3d 138, 145 (1st Cir. 1995)).  Any facts
proffered by the defendant are also considered, but only to the
extent they are not disputed by the plaintiff's properly
documented facts.  <u>Id.</u>  And, "despite the liberality of this
standard," it does not require the court "to credit conclusory
allegations or draw farfetched inferences."  <u>Mass. Sch. of Law at
Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 34 (1st Cir. 1998)
(internal quotation marks omitted).


## II.  <u>Background</u>

This action arises out of a contract for Foss to supply S
Group with goods, specifically, "M3H83A2 moldable material with

100% polyester backing," for S Group's use in manufacturing trunk lining to be installed in Ford Motor Company vehicles.  While Foss was organized under Nevada law, it maintains its manufacturing and customer service operations in Hampton, New Hampshire.  Foss submitted a bid for the contract in the form of a letter from, and signed by, its sales agent in Michigan, McCarthy Group, Inc., to S Group at that company's business office in Webberville, Michigan.  The bid indicated that the material was "F.O.B. Hampton, NH, freight collect," meaning that S Group would be responsible for the costs of transporting the material from Foss's Hampton location, and required S Group to give Foss twelve weeks' advance written notice of "[e]ngineer changes/obsolescence."  The bid also noted that its pricing was "valid for 90 days."  Though Foss made the bid at S Group's request, there is no indication how this request was communicated to Foss; S Group's president, for his part, says that "[t]hroughout the entire negotiation process, [he] spoke with members" of McCarthy Group in Michigan.

Four days after the bid, Foss sent S Group a document entitled "Conditions of Sale," which states, in relevant part:

> **Applicable Law** – This agreement consists only of the terms on both sides of this document and any attachments thereto.  Any modifications must be in writing and signed by both parties.  This agreement shall be deemed to have been entered into in Hampton,

3

> New Hampshire and the laws of the State of New
> Hampshire shall apply.

If there was anything on the other side of, or attached to, this document, it has not been submitted to the court; there is likewise no evidence that Foss ever alerted S Group that the "Conditions of Sale" were intended to apply to the bid or that S Group understood them as such or, indeed, ever saw them.  All that Foss says is that they "were mailed to S Group."  And the bid, submitted independently from (and four days prior to) the "Conditions," nowhere makes reference to them or any other terms other than those stated in the bid itself.

Within ninety days of the bid, S Group sent Foss a purchase order in response.  Foss alleges that this purchase order calls for the company to supply 5,000 yards of the material each week beginning on December 3, 2007 with "No Stop," meaning that the shipments would continue indefinitely (subject to S Group's right to cancel twelve weeks in advance, as just noted).  Foss's chief operating officer says that the purchase order was submitted to the company's customer service office in New Hampshire, but the document itself identifies the supplier as "FOSS MFG CO, PO BOX 3800-57, BOSTON MA 02241," the address to which S Group says the

4

purchase order was sent.[2]  The same is true of a subsequent
purchase order, with a minor amendment not relevant here, which
was ultimately approved by Foss's customer service department.
At oral argument, counsel for Foss represented that these
purchase orders were indeed sent to its New Hampshire facility,
but that they bear a Massachusetts address belonging to Foss's
lender and to which payments under the contract were to be sent.

S-Group later signed a document with additional conditions,
called "Scheduling Rules," but there is nothing to indicate how
this document was exchanged or where it was executed.[3]  In
accordance with these rules, S Group made arrangements to ship
six periodic installments of material from Foss's New Hampshire
facility to Michigan through a third party delivery service.  S
Group sent the payment for the first shipment of material to
Foss's address in Boston.

After the first shipment arrived, however, S Group
complained that the material was "delaminating."  These
complaints were initially directed to McCarthy in Michigan, but,
between December 13, 2007 and February 26, 2008, S Group

---

[2]S Group later e-mailed a copy of the purchase order to a
Foss employee working at its New Hampshire facility.

[3]Prior to S Group's assent to the "Scheduling Rules," it
corresponded by e-mail with a Foss employee in New Hampshire
about whether the goods would be delivered or picked up.

contacted Foss's New Hampshire office by phone or e-mail on
approximately five occasions.  The last of these contacts was a
conference call in which Foss agreed to send representatives from
New Hampshire to S Group's Michigan facility in an effort to
resolve its problems.

     After that visit, Foss claims, its representatives concluded
that S Group's manufacturing process, rather than the goods
themselves, had caused the problems reported by S Group; the
representatives advised S Group on adjusting its process to avoid
the problems.  S Group nevertheless allegedly refused to pay for
the material it received between January and March 2008 and gave
notice that it would not accept further deliveries, despite the
fact that Foss had maintained twelve weeks' worth of inventory as
required by the parties' agreement.  Foss then commenced this
action in New Hampshire Superior Court, from which it was duly
removed here by S Group, seeking damages from its non-payment and
refusal to accept the inventory.


III. **<u>Analysis</u>**

     "Personal jurisdiction implicates the power of a court over
a defendant . . . both its source and its outer limits are
defined exclusively by the Constitution," namely, the due process
clause of the Fourteenth Amendment.  <u>Foster-Miller</u>, 46 F.3d at

143-44 (citing <u>Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites</u>
<u>de Guinee</u>, 456 U.S. 694, 702 (1982)). The Constitution
contemplates both general jurisdiction, based on the defendant's
continuous and systematic activity in the forum state, and
specific jurisdiction, based on the nexus between the plaintiff's
claims and the defendant's forum-based activities. <u>See</u>, <u>e.g.</u>,
<u>Hannon</u>, 524 F.3d at 279. Foss has not alleged general
jurisdiction over S Group--and could not demonstrate it, <u>see</u>
<u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408,
414 (1984)--so Foss must show specific jurisdiction.

This showing normally consists of two parts: first, that
applicable long arm statute provides for jurisdiction over the
defendant and, second (if it does), that exercising jurisdiction
comports with due process. <u>See</u>, <u>e.g.</u>, <u>Hannon</u>, 524 F.3d at 280.
As the parties recognize, though, New Hampshire's applicable
long-arm statute, N.H. Rev. Stat. Ann. 510:4, allows jurisdiction
to the same extent allowed by the Constitution, so the court
moves directly to the constitutional analysis. <u>See</u> <u>Phillips</u>
<u>Exeter Acad. v. Howard Phillips Fund</u>, 196 F.3d 284, 287 (1st Cir.
1999); <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1388 (1st Cir. 1995).

For this court to exercise personal jurisdiction over S
Group in New Hampshire, the company must have "sufficient minimum
contacts with the state such that 'maintenance of the suit does

7

not offend traditional notions of fair play and substantial justice.'" Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)) (further internal quotation marks omitted). This constitutional standard consists of three elements: relatedness, purposeful availment, and reasonableness. See, e.g., Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008), cert. denied, 129 S. Ct. 999 (2009). To carry its burden to show personal jurisdiction, "[t]he plaintiff must demonstrate that each of these three requirements is satisfied." Id.

"Generally, relatedness refers to the requirement that the underlying claim 'arise out of' or be 'related to' the activities within the forum state." Adelson, 510 F.3d at 49. To satisfy this test for a contract claim, then, a court must "ask whether the defendant's activity in the forum state was "'instrumental either in the formation of the contract or its breach.'" Id. (quoting Phillips Exeter, 196 F.3d at 289). Foss argues that S Group's contacts with New Hampshire were both "essential to the formation of the contract" and "similarly instrumental in effecting the breach." The court disagrees on both counts.

First, while Foss accuses S Group of having "actively solicited Foss" as a supplier, there is no evidence that S Group directed any of that activity into New Hampshire. As noted

8

above, Foss says that it submitted its bid at S Group's request,
but conspicuously does not say where that request was received.
And the bid itself did not come from Foss's New Hampshire
facility, but from the office of the company's agent in Michigan,
with whom S Group says it negotiated the deal.  So, while the
court must assume the truth of all of Foss's evidentiary
proffers, and give it the benefit of all reasonable inferences to
be drawn from them, they simply do not support Foss's suggestion
that it was solicited by S Group in New Hampshire, which is what
matters to the jurisdictional inquiry.  "If the negotiations
occurred outside the forum state, their existence cannot serve to
bolster the argument for . . . jurisdiction in the forum."
United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,
960 F.2d 1080, 1090 (1st Cir. 1992).

        Foss also relies on its chief operating officer's statement
(which, as noted above, was explained by counsel at oral argument
due to its contradiction by the documents themselves) that S
Group sent its purchase orders into New Hampshire.  Because those
purchase orders amounted to S Group's acceptance of Foss's offer,
Foss argues, it follows that the contract was formed in New
Hampshire.  This argument, however, ignores the Supreme Court's
"highly realistic approach" to assessing personal jurisdiction
over contract claims, i.e., "that a 'contract' is ordinarily but

9

an intermediate step serving to tie up prior business
negotiations with future consequences which themselves are the
real object of the business transaction." Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 479 (1985).  "It is these factors--prior
negotiations and contemplated future consequences, along with the
terms of the contract and the parties' actual course of dealing--
that must be evaluated in determining whether the defendant
purposefully established minimum contacts within the forum."  Id.

     In the court's view, S Group's sending a purchase order to
Foss in New Hampshire does not fairly suggest that S Group
"purposefully established minimum contacts within the forum" so
as to give rise to jurisdiction over it here.  By Foss's own
account, the purchase orders were simply "in conformance with the
Price Quotation," which was itself the result of negotiations
that did not occur in New Hampshire.[4]  It is "the content of the
parties' interactions that creates constitutionally significant
contacts," not the simple fact that interactions occurred.
Phillips Exeter, 196 F.3d at at 290.  S Group's few contacts with
Foss in New Hampshire are insufficiently related to the formation

---

     [4]The same is true of the few e-mails S Group sent to one of
Foss's employees in New Hampshire, see notes 1-2, supra.

of the agreement to support jurisdiction here.[5]  See U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11-12 (1st Cir. 1990) (ruling that defendant did not subject itself to jurisdiction over dealer's claim for wrongfully terminating its dealership by sending a letter awarding the dealership into the forum because the parties' agreement resulted from negotiations that had no connection to the forum); Dalmau Rodriquez v. Hughes Aircraft Co., 781 F.2d 9, 15 (1st Cir. 1986) (rejecting jurisdiction over a supplier on a products liability claim based on defendant's submission of a bid into the forum state).

Foss also relies heavily on the provision in the "Conditions of Sale" that "This agreement shall be deemed to have been entered into in Hampton, New Hampshire and the laws of the State of New Hampshire shall apply."  But, as discussed supra, these "Conditions" were not submitted with or referenced in Foss's bid, and there is no evidence that S Group was even aware of them.[6]

---

[5]Indeed, the court of appeals has held that placing an order with a manufacturer in a forum, together with other "ancillary" conduct, is not enough to subject the purchaser to personal jurisdiction there.  See Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079 (1st Cir. 1973), discussed at length infra.

[6]At oral argument, Foss contended that, because the "Conditions" were transmitted to S Group before it submitted its purchase orders, those purchase orders necessarily amounted to an acceptance of the "Conditions"--at least in the absence of any other evidence.  Because the "Conditions" were neither referenced in nor (at least in the form filed with the court) made reference

11

Putting that concern aside, though, the provision does not have the import Foss ascribes to it, i.e., a binding stipulation that the parties' agreement was formed in New Hampshire.  The Supreme Court has explicitly held, in fact, that "such a provision standing alone [is] insufficient to confer jurisdiction."  <u>Burger King</u>, 471 U.S. 482.[7]

Second, the court disagrees with Foss that S Group's contacts with Foss in New Hampshire were "instrumental" to the alleged breach of the contract.  In support of this theory, Foss relies exclusively on S Group's communications to Foss in New Hampshire complaining about the perceived defects in the material and, eventually, notifying Foss that S Group would not accept

---

to the bid, which was Foss's offer, it is difficult to see how they would have become part of that offer--at least in the absence of any other evidence.  Moreover, Foss's bid appears to be a "firm offer" under Article 2-205 of the Uniform Commercial Code, so it could not have been withdrawn--or modified by additional conditions--until the passage of the ninety-day period recited in the offer.  <u>See</u> <u>Mid-S. Packers, Inc. v. Shoney's, Inc.</u>, 761 F.2d 1117, 1121 (5th Cir. 1985) (ruling that offeror could raise the price set forth in its firm offer, but only after the time for acceptance had expired).  Because the court assumes that the conditions were nevertheless part of the parties' agreement, however, it need not decide the issue.

[7]<u>Burger King</u> also holds that such a provision can nevertheless "reinforce[] [a defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."  <u>Id.</u>  As discussed <u>infra</u>, though, because S Group was merely a passive purchaser, there is no "deliberate affiliation with" or "reasonable foreseeability of possible litigation in" New Hampshire to "reinforce."

further delivery.  Both this court and the court of appeals,
however, have held that a defendant's communications to the
plaintiff in the forum announcing that the defendant does not
intend to perform under the parties' agreement do not support
jurisdiction over the defendant in a subsequent action for
breach.  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 622
(1st Cir. 2001); Elliott v. Armor Holdings, Inc., 2000 DNH 12,
25.  As this court has reasoned, such communications "constitute
notice to [the plaintiff] of the alleged breach, rather than the
actual mechanism of breach" and therefore are "not instrumental
in causing the breach and do not satisfy the relatedness
requirement."  Elliott, 2000 DNH 12, 25 (citing Ticketmaster-
N.Y., Inc. v. Alioto, 26 F.3d 201, 207 (1st Cir. 1994)).

      Instead, the court of appeals has indicated, "a contract
arguably is breached where a promisor fails to perform."
Phillips Exeter, 196 F.3d at 291.  Because S Group directed its
payments to Massachusetts, that forum would appear to be the
situs of the alleged breach, at least insofar as it arises out of
S Group's non-payment for goods received.  As to Foss's claim
that S Group breached by refusing to accept additional goods, it
might be argued that non-performance occurred in New Hampshire on
the theory that S Group had agreed to take delivery of the goods
here; but Foss makes no such argument, and in any event the court

of appeals has also indicated that the place of non-performance
"alone does not possess decretory significance."[8]  Id.  So Foss,
like the plaintiff in Phillips Exeter, "offers no convincing
argument as to why the location [of the alleged non-performance]
is entitled to greater suasion here" than in the ordinary case.
Id.; see also Elliott, 2000 DNH 12, 25.

Because Foss has not shown that its claims arise out of or
relate to S Group's contacts with New Hampshire, either in the
sense that they were essential to the alleged making or breaking
of the parties' agreement or otherwise, it has failed to satisfy
the relatedness element of the specific jurisdiction test.  See,
e.g., Guy v. Starwood Hotels & Resorts Worldwide, Inc., 2005 DNH
004, 7-9; PFIP, LLC v. Planet Fitness Enters., Inc., 2004 DNH
159, 12-17; Elliot, 2000 DNH 12, 22-27.  While, as Foss notes,
"the relatedness test is a flexible, relaxed standard," it "is
not met merely because a plaintiff's cause of action arose out of

---

[8]As became clear at oral argument, fixing the location of an
alleged breach of contract, at least when that breach takes the
form of non-payment, is a highly artificial exercise:  S Group
argued that the alleged breach occurred at its office in
Michigan, from which the payment would have emanated, while Foss
argued that the alleged breach occurred at its office in New
Hampshire, at which it ultimately would have been received.
Neither view is supported by Phillips Exeter, which treats the
place where the payment was due under the contract--which in this
case was Massachusetts--as the location of the breach.  The fact
that both views are plausible, though, helps to explain Phillips
Exeter's caution that this factor cannot bear much weight.

the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." <u>Sawtelle</u>, 70 F.3d at 1389. Foss's contract claims are unrelated to S Group's minimal contacts with New Hampshire, all of which occurred after the contract had already been negotiated elsewhere and, if anything, merely set the stage for the alleged eventual breach.

Foss has therefore not carried its burden to show specific jurisdiction over S Group in this court. <u>See</u>, <u>e.g.</u>, <u>Phillips</u>, 530 F.3d at 27. While this court need not address the purposeful availment aspect of the jurisdictional inquiry, then, <u>see</u>, <u>e.g.</u>, <u>Phillips Exeter</u>, 196 F.3d at 291, the court nevertheless rules that Foss has failed to make that showing as well, largely for the same reasons that its relatedness arguments fall short, <u>see</u> <u>id.</u> at 289 (noting "a natural blurring of the relatedness and purposeful availment inquiries in cases in which the alleged contacts are less tangible than physical presence") (parenthetical omitted).

To demonstrate purposeful availment, a plaintiff must show that the defendant "purposefully availed itself of 'the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts

15

foreseeable.'  As the formulation suggests, purposeful availment involves both voluntariness and foreseeability." Phillips, 530 F.3d at 28 (quoting Daynard, 290 F.3d at 61 (further internal quotation marks omitted)).  Foss's argument for purposeful availment rests largely on the fact that S Group voluntarily entered into a contract for goods to be manufactured in New Hampshire, putting it on notice of the potential for litigation in this forum should the relationship turn sour.

This argument relies heavily on the decision by the court of appeals in Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079 (1st Cir. 1973), but that case is in fact pointedly to the contrary.  There, one of the defendants, United Aircraft, ordered a shipment of material from the plaintiff, a Massachusetts corporation, to test the material for compatibility with United's manufacturing process.  Id. at 1081.  While the solicitations had occurred outside the forum, United had contacted the plaintiff's "employees in Massachusetts by telephone, teletype, or mail on thirteen occasions and visited [the plaintiff's] Massachusetts facility on four instances during [the] qualification period." Id.  United eventually decided that the plaintiff's material was compatible, leading to vendor agreements between those parties (which were made outside of Massachusetts) as well as orders from two other defendants, who planned on forging the material into

16

jet turbines after it had undergone United's process.  <u>Id.</u>
Within months, however, United discovered a weakness in the
plaintiff's material, but--during a visit by one of United's
employees to the plaintiff's Massachusetts facility--the employee
represented that United would accept the material regardless,
inducing the plaintiff to enter into written supply contracts
with all the defendants.  <u>Id.</u> at 1082.  When the defendants later
refused to accept the material anyway, the plaintiff sued them in
federal district court in Massachusetts.  <u>Id.</u>

The court of appeals ruled that the district court had
personal jurisdiction over United, but not the other defendants.
<u>Id.</u> at 1084-85.  Noting that "United personnel regularly
communicated with and frequently visited" the plaintiff's
Massachusetts facility, the court concluded that "United either
actively supervised or actually participated in [the plaintiff's]
initial development" of the product so as to elevate "United's
participation in the commercial life of Massachusetts above that
of a purchaser who simply places an order and sits by until the
goods are delivered."[9]  <u>Id.</u> at 1084.

_____

[9]The court of appeals also found "an independent basis for
jurisdiction" over United in Massachusetts in the alleged
misrepresentation its employee had made to the plaintiff while
visiting its facility there.  482 F.2d at 1084.  Foss does not
claim that an S Group employee was ever physically present in New
Hampshire, let alone that he or she engaged in actionable conduct
while here.

Here, however, S Group was just such a purchaser:  like
United in the Whittaker case, S Group solicited and negotiated a
deal with Foss through communications that took place outside of
the forum, but, unlike United, S Group neither "regularly
communicated with" nor "visited"--at all--Foss's facility.[10]  And
the limited communications that S Group did have with Foss do not
support the inference that S Group "actively supervised or
actually participated in" Foss's manufacture of the goods.  When
S Group reported problems with the material, in fact, the parties
tried to resolve them by having Foss's New Hampshire employees
visit S Group's Michigan facility, not the other way around.

S Group's activities, then, much more closely resemble those
of the other defendants in Whittaker, over whom the court of
appeals found personal jurisdiction lacking because "their
contacts were limited and not suggestive of the type of
supervision or participation in which United apparently engaged."
Id. at 1085.  Instead, the court of appeals reasoned, "the
primary contact these two defendants had with Massachusetts was
[the plaintiff's] performance of their contracts within the
Commonwealth," with "[t]he remainder of their activities . . .
'ancillary' to the placement of these orders."  Id.

---

[10]Again, S Group did send a handful of e-mails to Foss's
employees in New Hampshire.

18

While, as Foss emphasizes, S Group did agree to purchase material manufactured in New Hampshire, its other contacts with the forum were limited to carrying out its end of the deal, e.g., by arranging for third-party receipt of the goods here.  Though Foss suggests otherwise, simply "entering into a manufacturing agreement with the resident of a forum" is not enough to support personal jurisdiction there, as the court of appeals held in Whittaker.[11]  482 F.2d at 1085; see also Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 933 (1st Cir. 1985).  So that case considerably hurts, rather than helps, Foss's jurisdictional argument--if it does not vitiate it altogether.

In this circuit, to show that a defendant purposefully availed itself of the privilege of conducting business in a forum, a plaintiff must show that "the commercial action taken, in light of the contacts with the forum state it entailed, amounts to a purposeful decision by the nonresident to 'participate' in the local economy and to avail itself of the

---

[11]This has become known as the "passive purchaser" doctrine. See, e.g., WPI Elecs., Inc. v. Super Vision Int'l, Inc., 2000 DNH 023, 12-16 (collecting cases).  In WPI Electronics, this court developed a set of factors, culled from the caselaw, "to distinguish a passive purchaser from an active purchaser."  Id. at 13-16.  Neither party addresses these factors--indeed, neither invokes the "passive purchaser" doctrine--but considering them only reaffirms this court's conclusion that it cannot exercise personal jurisdiction over S Group based on its contracting for goods to be manufactured in New Hampshire.  See id.

benefits and protections of the forum." Bond Leather, 764 F.2d at 934; see also Whittaker, 482 F.2d at 1084-85. As just discussed, Foss has not made that showing.

After S Group contracted for the goods, it simply awaited their production, rather than "actively supervis[ing] or actually participat[ing]" in that process here. Whittaker, 482 F.2d at 1084. While, as also just discussed, the contract resulted from S Group's solicitation of a bid from Foss, that solicitation process did not entail any contacts with Foss in New Hampshire, and therefore does not suggest that S Group purposefully availed itself of the privilege of doing business here. See Phillips Exeter, 196 F.3d at 292; cf. Daynard, 290 F.3d at 62 (observing that jurisdiction may exist "where the defendant initiated the transaction by mailing or calling the plaintiff in the forum"); Hahn v. Vt. Law Sch., 698 F.2d 48, 51-52 (1st Cir. 1983) (finding jurisdiction where defendant law school sent materials to the forum state soliciting an application from plaintiff). Nor has Foss identified any other actions by S Group "to exploit the local economy" here. Bond Leather, 764 F.2d at 934; see also Whittaker, 482 F.2d at 1084-85 (relying on the absence of "prior dealing" between the plaintiff and the defendants to conclude that they "may more legitimately claim surprise at being required

to defend" in the plaintiff's home state than another defendant with a "five year history of prior dealing" with the plaintiff).

Foss emphasizes the "No Stop" nature of its agreement to supply material to S Group, arguing that it "envisioned an ongoing relationship with a New Hampshire resident for goods produced in and shipped from New Hampshire," but this considerably overstates the depth of S Group's commitment to Foss.  Again, as Foss alleges in support of its claim for the value of the rejected inventory, the parties' agreement obligated S Group to continue accepting the goods only until it gave twelve weeks' notice that it no longer needed them.  This is a far cry from the sort of "ongoing relationship"--such as, for example, between a franchisor and a franchisee--making it "presumptively reasonable" for a defendant "to be called to account" for breach in the plaintiff's home courts.  Burger King, 471 U.S. at 480 (finding jurisdiction over claims for breach of franchise agreement creating "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts").

As discussed supra, Foss also relies on the choice-of-law provision from the "Conditions of Sale," but that provision is insufficient.  At the risk of beating a dead horse, a defendant does not purposefully avail himself of the privileges of conducting business in a forum through its mere agreement to

21

purchase goods from the plaintiff in the forum--even if the agreement also chooses the forum's law.  See WPI Elecs., 2000 DNH 023, 15 (treating choice-of-law clause as simply one factor in "passive purchaser" analysis); cf. Ganis Corp. of Calif. v. Jackson, 822 F.2d 194, 198 (1st Cir. 1987) (reasoning that a choice-of-law provision for the forum's law was "not conclusive" but "further tip[ped] the scales in favor of [jurisdiction]" where the contract also called for payments to be sent to the forum and created a five-year relationship with the plaintiff).

To sum up, S Group did nothing to purposefully avail itself of the privilege of conducting activities in this forum apart from agreeing to purchase material manufactured here.  S Group did not negotiate the agreement through any contacts with New Hampshire; it did not supervise or participate in the production of the goods in New Hampshire; it had no prior dealings with Foss in New Hampshire; and the agreement did not require S Group to send payments or tender any other performance in New Hampshire save the "ancillary" conduct of sending purchase orders to Foss in New Hampshire and arranging for a third party to receive the goods here.  That makes S Group a passive purchaser not subject

to personal jurisdiction in New Hampshire.[12]  See Whittaker, 482 F.2d at 1084-85.

### III. **Conclusion**

Because Foss has satisfied neither the relatedness or the purposeful availment elements of the test for personal jurisdiction, the court need not consider the reasonableness element.  See, e.g., United Elec., Radio & Mach. Workers, 960 F.2d at 1091 n.11.  S Group's motion to dismiss for lack of personal jurisdiction (document no. 4) is GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 27, 2009

─────────────

[12]It also distinguishes this case from prior decisions of this court, cited by Foss, which exercised jurisdiction over out-of-state purchasers.  See Raymarine, Inc. v. Argonaut Computer, Inc., 2002 DNH 147, 15-17 (defendant entered into a three-year relationship to buy "complex products modified to fit [its] specific requirements," negotiated by directing communications into New Hampshire); WPI Elecs., 2000 DNH 023, 17-23 (similar); Robbins Motor Transp., Inc. v. U.S. Sea Launch Ltd. P'ship, 2001 DNH 188, 12 (defendant sent an employee to New Hampshire to oversee the plaintiff shipping company's receipt and preparation of an item for transport to defendant's home state).

```
cc:  Lawrence M. Edelman, Esq.
     Mark A. Harmon, Esq.
     Jacquelyn R. Trussell, Esq.
     William P. TeWinkle, Esq.
     Stephanie E. Waldon, Esq.
     Kenneth D. Murphy, Esq.
```